UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| Cody Prudente, as Personal Representative of the Estate of John Prudente, Jr., deceased; | ) ) ) ) | Civil No: 1:22-cv-00024 |
| Sandra Prudent; and | ) ) ) | **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| John Prudente, Sr., | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| Mary Hamilton, individually and in her official capacity as a City of Mandan Police Officer; | ) ) ) ) | |
| Joshua Scherr, individually and in his official capacity as a City of Mandan Police Officer; | ) ) ) ) | |
| Dominic Hanson, individually and in his official capacity as a City of Mandan Police Officer; | ) ) ) ) | |
| Peter Czapiewski, individually and in his official capacity as a Lieutenant of City of Mandan Police; | ) ) ) ) | |
| David Raugust, individually and in his official capacity as a Sergeant of City of Mandan Police; and | ) ) ) ) | |
| City of Mandan, | ) ) | |
| Defendants. | ) ) | |

COMES NOW, Mary Hamilton, individually and in her official capacity as a City of

Mandan Police Officer, Joshua Scherr, individually and in his official capacity as a City of

Mandan Police Officer, Dominic Hanson, individually and in his  official capacity as a City

of Mandan Police Officer, Peter Czapiewski, individually and in his official capacity as a Lieutenant of City of Mandan Police, David Raugust, individually and in his official capacity as a Sergeant of City of Mandan Police, and City of Mandan[1], for their brief in support of motion for summary judgment on Plaintiff's 42 U.S.C. § 1983 wrongful death claim, 42 U.S.C. § 1983 survival action claim, 42 U.S.C. § 1983 deprivation of rights of Plaintiff's to familial relationship with decedent, assault and battery, and police negligence.

<u>FACTUAL BACKGROUND</u>

[1]     On February 8, 2020, John Prudente, Jr. (hereinafter "Prudente"), died during an altercation with law enforcement.

[2]     **<u>Summary Timeline of Events – February 8, 2020:</u>**

4:45 p.m.:    Officer Mary Hamilton (hereinafter "Officer Hamilton") conducted a traffic stop of a gold Ford Fusion bearing North Dakota license plate 578 BWD, which was being operated by Prudente. During the traffic stop, it was confirmed that Prudente had an active arrest warrant out of Bismarck for an unpaid parking ticket.

4:55 p.m.:    Officer Hamilton and Sergeant David Raugust (hereinafter "Sergeant Raugust") approached Prudente's vehicle. Officer Hamilton advised Prudente of the warrant for his arrest. Prudente began arguing with Officer Hamilton and stated he was not going to jail.

4:56 p.m.:    Prudente fled from the traffic stop.

4:57 p.m.:    Sergeant Raugust and Officer Hamilton arrived at 202 7th Avenue Southwest in Mandan. The gold Ford Fusion was parked in the driveway of this residence. Sergeant Raugust and Officer Hamilton confronted Prudente and attempted to place him in custody. John Prudente Sr (hereinafter "John Sr) was present outside the residence. During the altercation, both Sergeant Raugust and Officer Hamilton deployed their Tasers as they attempted to arrest Prudente. A physical confrontation occurred as Prudente resisted. During the altercation, Sergeant Raugust was bitten by Prudente.

---

[1] Hereinafter referred to collectively as "Defendants" or individually.

5:00 p.m.:     Lieutenant Peter Czapiewski (hereinafter "Lieutenant Czapiewski") arrived on scene and assisted Sergeant Raugust and Officer Hamilton with handcuffing Prudente.  Other officers began arriving on scene at this time.

5:01 p.m.:     Officers handcuffed Prudente. Prudente continued to yell and struggle with officers after being handcuffed and placed on his side.

5:02 p.m.:     Officers on scene requested Metro Area Ambulance respond to the scene to evaluate Prudente Metro Area Ambulance and Mandan Fire were dispatched to the scene.

5:03 p.m.:     Prudente's mother arrived on scene.

5:05 p.m.:     Prudente became unresponsive. Officers requested the ambulance respond "code 3" and advised that Prudente was unresponsive and CPR was being administered by officers.

5:07 p.m.:     Officer Brandon Hauck (hereinafter "Officer Hauck") obtained an AED and placed the pads on Prudente. No shock was advised. Officer Joshua Scherr (hereinafter "Officer Scherr") and Officer Hauck continued to administer CPR to Prudente.

5:08 p.m.:     Members of the Mandan Fire Department arrived on scene and assisted with performing life saving measures. Officer Hauck administered Narcan at the direction of firefighters. Metro Area Ambulance personnel arrived on scene and began performing life saving measures on Prudente.

5:17 p.m.:      Prudente was placed in the back of the ambulance.

5:26 p.m.:     The ambulance left the scene to transport Prudente to Sanford Hospital.

5:30 p.m.:     The Mandan Fire Department left the scene.

5:35 p.m.:     The ambulance arrived at Sanford Hospital with Prudente where he was later pronounced deceased.

8:32 p.m.:     Metro Area Ambulance personnel transported Prudente's body from Sanford Hospital to the state medical examiner's office.

(See e.g., Affidavits of David Raugust (Exhibit 1), Peter Czapiewski (Exhibit 2), Dominic Hanson (Exhibit 3), Mary Ternes fka Mary Hamilton (Exhibit 4), Joshua Scherr (Exhibit 5), and Brandon Hauck (Exhibit 6)).

[3]   **Details of Law Enforcement's Involvement**:

[4]   *Sergeant Raugust:* On February 8, 2020, at approximately 1645 hours, he was nearing the end of his patrol shift. (Affidavit of David Raugust, ¶ 3). Officer Hamilton had radioed that she was stopping a vehicle. Id. During the radio traffic put out by Officer Hamilton, she was notified by dispatch that Prudente had a warrant for his arrest. Id. Sergeant Raugust decided to head to her location and assist. Id. All appeared okay upon his arrival. Id. Both Officer Hamilton and Sergeant Raugust approached Prudente's vehicle. Id.

[5]   Officer Hamilton informed Prudente of the warrant and he became upset and started yelling. (Affidavit of David Raugust, ¶ 4). Sergeant Raugust went to open the passenger door and Prudente grabbed the shifter in his vehicle, put it in drive, and drove off. Id. Officer Hamilton radioed that Prudente had fled the stop. Id.

[6]   Prudente did not flee far. (Id. at ¶ 5). The officers were able to catch up. Id. As Sergeant Raugust pulled up, Prudente began yelling at him. Id. As Prudente was trying gain entry into a residence, Sergeant Raugust instructed him to stop. Id. He pulled out his taser and aimed it at Prudente. Id. Sergeant Raugust continued to yell and Prudente took off running. Id. Sergeant Raugust gave chase and ran after him, eventually deploying his taser. Id. He believed he missed, and the taser had no effect. Id. He continued to chase Prudente. Id.

[7]   Sergeant Raugust attempted to gain control of Prudente and bring him to the ground. (Id. at ¶ 6). Prudente was able to poke Sergeant Raugust in the eye and dislodge a contact. Id. Prudente also bit his arm. Id. Sergeant Raugust was able to pull his arm out of his mouth and Prudente spun into him to which Prudente clawed at Seargeant Raugust

and continued to fight. Id. They continued to stumble. As the wrestling continued, he could hear Officer Hamilton giving commands and trying to gain control. Id.

[8]     As more officers arrived, they were able to try and gain control of Prudente. (Id. at ¶ 7). John Sr began yelling at Prudente to stop fighting. Id. The officers were able to handcuff him as he continued to yell and scream. Id. Sergeant Raugust was unable to understand Prudente. Id.

[9]     Sergeant Raugust then got up and grabbed several items that were torn off his uniform. (Id. at ¶ 8). He then noticed that Prudente became quiet and was turning purple in his face. Id. Officers then dispatched the ambulance and Prudente's handcuffs were removed and life saving measures began. Id.

***

[10]     *Officer Mary Hamilton:* On February 8, 2020, at approximately 1650 hours, she was parked in her patrol vehicle when she observed Prudente drive by with expired tags. (Affidavit of Mary Ternes f/k/a Mary Hamilton, ¶ 1). She pulled behind him, activated her lights, and initiated a traffic stop. Id.

[11]     She asked for his registration and license. (Id. at ¶ 2). Prudente's license had expired, and he was unable to find any insurance or registration cards. Id. She returned to her vehicle and had dispatch run a warrant and driver's license check. Id. Dispatch advised Officer Hamilton that Prudente had an unconfirmed bench warrant through the City of Bismarck for parking citations. (Id. at ¶ 3). She was then told that Sergeant Raugust was on his way to assist. Id.

[12]     Both Sergeant Raugust and Officer Hamilton approached the vehicle and advised Prudente of the warrant. (Id. at ¶ 4). Officer Hamilton asked him to step out of the vehicle.

Id. Prudente looked at her and said something to the effect of he was not going to be arrested and he proceeded to put the car in drive and drove off. Id.

[13]    Officer Hamilton notified dispatch that he was fleeing, and she began to follow. Id. She parked and exited her vehicle. (Id. at ¶ 5). She was unable to see Prudente or Sergeant Raugust. Id. She could hear active taser deployment coming from the back of Prudente's residence. Id. She then heard yelling. Id. Officer Hamilton then notified dispatch that a taser was deployed and Prudente was fighting. Id.

[14]    She followed the sound and began chasing Prudente. (Id. at ¶ 6). Officer Hamilton pulled her taser and pointed it at him. Id. She instructed him to get to the ground. Id. At this time, Prudente was pacing and yelling between Officer Hamilton and Sergeant Raugust. Id. Sergeant Raugust was able to grab Prudente. Id.

[15]    Prudente would not comply with any verbal commands, so she drive stunned[2] him in the butt. Id. However, Prudente was moving so much she was unable to hold the taser on him. Id. Officer Hamilton then stood back in an effort to get a clear shot. She deployed her taser into his back side which did not seem to faze Prudente. Id. Officer Hamilton also tried to grab his right side, but Prudente was swinging his arms. Id. Sergeant Raugust and Prudente fell over, and she went with them. Id. Prudente was then face down and still resisting. Id.

[16]    Prudente was kicking his legs and trying to roll around. Id. Officer Hamilton again tried to stun drive him, but it had no effect. Id. Other officers approached.  Id. Lieutenant Czapiewski and Sergeant Raugust were able to grab his arms and Officer Hamilton cuffed him. Id.

---

[2] This is done by activating the TASER and placing it against an individual's body.

[17]    While they were struggling with Prudente, John Sr was pacing around them and was yelling that Prudente has mental health issues. (Id. at ¶ 7).  Lieutenant Czapiewski advised dispatch to send out an ambulance to have Prudente medically cleared. (Id. at ¶ 8).  Officer Hamilton observed Lieutenant Czapiewski and Officer Scherr holding onto Prudente who was lying on his side. Id. Officer Scherr then said that Prudente was having medical issues and said to run code 3 (Emergency - Proceed immediately with lights and siren). (Id. at ¶ 9). Lieutenant Czapiewski removed Prudente's handcuffs. Officer Hauck began a sternum rub to which Prudente did not respond. Id. Officer Scherr began CPR. Id. The ambulance then arrived. Id.

***

[18]    *Lieutenant Czapiewski:* Lieutenant Czapiewski overheard on the radio that Officer Mary Hamilton was initiating a traffic stop. (Affidavit of Peter Czapiewski, ¶ 3). Dispatch advised Officer Hamilton that Prudente had a warrant for his arrest. Id. Officer Hamilton later radioed that the vehicle being operated by Prudente was fleeing but that they were not pursuing. Id. Lieutenant Czapiewski overheard that the vehicle was possibly headed home, so he began to head that way. (Id. at ¶ 4). On his way, he overheard that there was "fighting", and he activated his lights. Id.

[19]    Sergeant Raugust, who was assisting Hamilton, radioed their location. Id. Upon arrival, Lieutenant Czapiewski heard yelling and observed taser cartridges on the ground. (Id. at ¶ 5). He observed Prudente on the ground screaming and kicking his legs. Id.  He was unable to understand what Prudente was saying. Id. Sergeant Raugust was to Prudente's left holding him down, Hamilton was towards his legs, and John Sr. was holding down Prudente's right side. Id. Lieutenant Czapiewski instructed John Sr to get

7

up and out of the way. Id. Lieutenant Czapiewski was struggling to get Prudente's left arm behind his back and Officer Hamilton was able to get one cuff on. Id.

[20]    After Prudente was handcuffed, Lieutenant Czapiewski placed Prudente in a recovery position (on his side). (Id. at ¶ 6). Lieutenant Czapiewski observed blood around Prudente's mouth and then called the ambulance. Id. Prudente was still conscious and talking when the ambulance was called. Id.

[21]    Prudente's parents were yelling that Prudente has mental health issues. (Id. at ¶ 7). Prudente eventually stopped moving and went limp and appeared to have passed out. Id. Lieutenant Czapiewski then checked for a pulse and did not find one. Id. He instructed Officer Scherr to remove his handcuffs and to begin CPR. Id. Lieutenant Czapiewski instructed Officer Hauck to get an automated external defibrillator (hereinafter "AED"). Id. Lieutenant Czapiewski then updated dispatch of the situation and told them to have the ambulance, who was already en route, to move expeditiously. (Id. at ¶ 8).

*** 

[22]    *Officer Brandon Hauck (not a named defendant):*   Officer Hauck responded to backup Officer Hamilton on the traffic stop which she advised was fleeing. (Affidavit of Brandon Hauck, ¶ 2). He overheard the radio advise Hamilton of the warrant. Id. Sergeant Raugust radioed the location and Officer Hauck proceeded to the location. Id. In route, he overheard Officer Hamilton appear to struggle with something or someone. Id. Officer Hamilton and Sergeant Raugust were not answering radio traffic. Id.

[23]    When he arrived, he observed John Sr hunched over near Sergeant Raugust's right side. (Id. at ¶ 3). Sergeant Raugust, Officer Hamilton and Lieutenant Czapiewski

were surrounding Prudente attempting to take him into custody. Id. Prudente was laying down. Id.

[24]    Officer Hauck instructed John Sr to back away and was yelling so he focused on containing John Sr, who eventually agreed to leave the scene. (Id. at ¶ 4).

[25]    He then turned his attention to Prudente and was advised to return the rifle to the patrol vehicle – which he did. (Id. at ¶ 5). When he returned to the scene, he observed that Prudente was no longer making noise or moving. Id. Officer Scherr began a sternum rub. Id. Officer Hauck then ran to his vehicle and returned with an AED and assisted with CRP. (Id. at ¶ 6). He was unable to detect a pulse. Id. Officer Hauck also administered Narcan. (Id. at ¶ 7). He rode in the back of the ambulance and remained with Prudente until a BCI agent arrived. Id.

*** 

[26]    *Officer Dominic J. Hanson:* At the time of the traffic stop, Officer Hanson was at the law enforcement center. (Affidavit of Dominic J. Hanson, ¶ 3).  He overheard on the radio that Prudente had a warrant and began to flee. Id. He then heard that Prudente was fighting so he proceeded to the location. Id. He did not recall any officers notifying others that the scene was secure. Id.

[27]    When Officer Hanson arrived, he observed Prudente was cuffed and actively moving and making noise. (Id. at ¶ 4). He heard Prudente shouting but could not understand what he was saying. Id. From what he recalls, the ambulance was requested before he got there as tasers were deployed. Id. John's mother, Sandy, began approaching and Officer Hanson kept her away. Id.  Sandy insisted that she could help

keep Prudente calm and was allowed to attempt from a distance. Id. Officer Hanson also observed blood on Sergeant Raugust and learned that Prudente had bitten him. Id.

[28]    Officer Hanson observed one officer performing a sternum rub. (Id. at ¶ 5). Officer Hauck ran to a patrol vehicle to obtain an AED. Id. Officer Hanson walked Sandy to the street to be further away. Id.  Prudente's parents were becoming agitated, so Hanson tried to calm them down. Id.

[29]    When the ambulance arrived, they asked the parents what medications he was on and about health issues. (Id. at ¶ 6).  They indicated that he has Schizophrenia and other mental health issues. Id. They said that the only drugs Prudente takes are those prescribed to him. Id.

***

[30]    *Officer Scherr:* He overheard on the radio that Prudente had a warrant and began to flee. (Affidavit of Joshua Scherr, ¶ 3). He then proceeded to the location to assist. Id. While in route, Sergeant Raugust radio that Prudente was fighting. Id. Upon arrival, he saw Officer Hamilton, Officer Hauck, Lieutenant Czapiewski, and Sergeant Raugust were on scene. Id. He assisted Lieutenant Czapiewski in keeping Prudente under control and on his side. Id. Prudente was screaming but he was difficult to understand. Id. Lieutenant Czapiewski advised Scherr to contact the ambulance. (Id. at ¶ 4). Prudente became unresponsive and Officer Scherr began a sternum rub. Id. He observed that Prudente's face turned bluish/purple and that he did not appear to be breathing. Id. He uncuffed Prudente and began chest compressions. Id. He assisted with getting Prudente loaded into the ambulance. Id.

***

10

[31]   On February 8, 2020, the Mandan Police Department contacted the North Dakota Bureau of Investigations (hereinafter "BCI") to conduct an independent and unbiased excessive force investigation. Sergeant David Raugust and Officer Mary Hamilton were placed on administrative duties during the investigation of the cause of death. (See Exhibit A to Affidavit of Lawrence E. King).  Special agents immediately began gathering all the facts and analyzed them thoroughly to develop a complete picture of what happened.

[32]   The investigation included the following acts:

- Review of dashcam audio and video footage from Lieutenant Czapiewski, Officer Hanson, and Deputy Shaun Peterson's patrol vehicles;

- Interviews of Cody Prudente, John Sr., and Sandra Prudente;

- A search of the exterior areas of Prudente's residence located at 202 7th Avenue Southwest in Mandan. The search included photographs and a collection of evidence;

- Review of the call for service reports from the Mandan Fire Department and Metro Area Ambulance Service;

- Review of the Axon Taser reports from the Tasers utilized by Sergeant David Raugust and Officer Mary Hamilton;

- Review of Prudente's toxicology reports;

- Review of the dispatch recordings and event report logs from Central Dakota Communications Center;

- Review of the completed written reports of Lieutenant Czapiewski, Officer Hauck, Officer Hanson, and Officer Scherr. The reports documented each officer's observations and actions.

- Review of photographs depicting the injuries Sergeant Raugust sustained from Prudente; and

- An agent attended Prudente's autopsy.

[33]    The information was provided to the Morton County State's Attorney's Office without recommendation. (See Exhibit C to Affidavit of Lawrence E. King). The Morton County State's Attorney's Office reviewed the information and determined no crime was committed by officers and no criminal charges were pursued. Id.

[34]    The results of the autopsy concluded the death of Prudente was due to Excited Delirium as a result of methamphetamine use and underlying diagnoses. (See Exhibit B to Affidavit of Lawrence E. King).

[35]    There was no evidence from the autopsy of excessive use of force. Id.  Sergeant Raugust and Officer Hamilton, who had been on administrative leave, returned to full duty. (See Exhibit A to Affidavit of Lawrence E. King).

<u>LAW AND ARGUMENT</u>

**1.    Summary Judgment Standard.**

[36]    Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986).

[37]    In <u>Celotex Corp. v. Catrett</u>, the United States Supreme Court articulated guidelines for applying Rule 56 to defense motions for summary judgment stating, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. The Court explained that, in such a situation, "'there can be no genuine issue as to any material fact', since a complete failure

12

of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. at 322-23.

[38]    Therefore, once a motion is made, the burden shifts to the Plaintiff to offer "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992) (quoting Barnes v. Arden Mayfair, Inc., 759 F.2d 676, 681 (9th Cir. 1985). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather the dispute must be outcome determinative under prevailing law." Holloway v. Pigman, 884 F.2d 365, 366 (8th Cir. 1989) (emphasis added). Moreover, if the Plaintiff fails to demonstrate the existence of a genuine issue of material fact by offering significant probative evidence, the Defendant is entitled to judgment in his favor as a matter of law. Pentel v. City of Mendota Heights, 13 F.3d 1261, 1263 (8th Cir. 1994).

[39]    The Plaintiff's beliefs are of no effect and do not create a genuine issue of material fact that precludes summary judgment. Marler v. Mo. Bd. of Optometry, 102 F.3d 1453, 1457 (8th Cir. 1996).

**2.      42 U.S.C. § 1983 Claim for Wrongful Death – All Defendants.**

[40]    The First Claim for Relief is for wrongful death against the City of Mandan and five of its police officers. Plaintiff's First Claim for Relief appears to proceed on the following theories: excessive force, acting with deliberate indifference to the decedent's medical needs, and failure to train and supervise.

**A.      Official Capacity – Named City of Mandan Police Officers.**

[41]    The Plaintiffs are seeking monetary and punitive damages against the five named officers in their official capacities. Because the five named police officers are state

13

employees, sovereign immunity bars any claim against them in their official capacity. It is well settled that the Eleventh Amendment bars actions, in Federal Court, which seek monetary damages from individual State Officers, in their official capacities, as well as State Agencies, because such lawsuits are essentially "for the recovery of money from the state." Ford Motor Co. v. Department of the Treasury, 323 U.S. 459, 464 (1945); see also Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983" when sued for damages.). The Court in Will explained as follows: "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is not different from a suit against the state itself." Id.

[42]    Furthermore, the doctrine of sovereign immunity deprives federal courts of jurisdiction over suits against states and their agencies, boards, commissions, and other "alter egos" of a state, unless that state has waived its immunity or Congress has abrogated that immunity pursuant through a valid exercise of Congressional power. Seminole Tribe of Fla. v. Fla., 517 U.S. 44, 54 (1996). Congress did not abrogate the states' sovereign immunity when it enacted 42 U.S.C. § 1983. See Will, 491 U.S. at 65-66.

[43]    Accordingly, Plaintiff's official capacity claims against the five named officers must be dismissed.

> ### B.    Individual Capacity – Named City of Mandan Police Officers.

[44]    Plaintiff's § 1983 claims against the individual officers must overcome the officers' defenses of qualified immunity. Howard v. Kansas City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009). In Saucier v. Katz, the United States Supreme Court mandated courts to

consider these two requirements in sequential order. 533 U.S. 194, 201 (2001). That is, the Court is required to determine whether the facts demonstrated the violation of a constitutional or statutory right *before* determining whether that right was clearly established. Thus, the Court must first decide whether the police officers violated Prudente's Fourth Amendment rights.

### i.    Fourth Amendment.

[45]    When evaluating excessive force claims under § 1983, "[t]he test is whether the amount of force used was objectively reasonable under the particular circumstances." Michael v. Trevena, 899 F.3d 528, 532 (8th Cir. 2018) (internal citations omitted). "Objective reasonableness is 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Id. (quoting Graham v. Connor, 490 U.S. 386, (1989)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97.

[46]    The use of force is least justified against a nonviolent misdemeanant who does not flee or actively resist arrest and poses little threat to officers or the public. Jackson v. Stair, 944 F.3d 704, 711 (8th Cir. 2019). "When a suspect is passively resistant, somewhat more force may reasonably be required." Wertish v. Krueger, 433 F.3d 1062, 1066–67 (8th Cir. 2006). The failure to follow police instruction may constitute passive resistance. See Ehlers v. City of Rapid City, 846 F.3d 1002, 1011 (8th Cir. 2017); see also Jackson, 944 F.3d at 711. Whether a suspect's resistance is intentional does not impact how a reasonable officer would interpret the suspect's behavior. Ehlers, 846 F.3d

at 1011. An officer is entitled to use the force necessary to effect an arrest where a suspect "at least appears to be resisting." Id. We have upheld the use of force where a suspect is non-compliant and resists arrest or ignores commands from law enforcement. See Jackson, 944 F.3d at 711.

[47]    The case law analyzing whether the use of a Taser during an arrest constitutes excessive force has evolved over time as use of the technology has become more commonplace. Generally speaking, the case law draws a distinction between the use of a Taser against a person passively resisting arrest and one who is physically resisting arrest. Courts have generally found use of a Taser against an arrestee who is only passively refusing to comply with officers' commands constitutes an excessive use of force. Zubrod v. Hoch, 232 F. Supp. 3d 1076, 1088 (N.D. Iowa 2017), aff'd, 907 F.3d 568 (8th Cir. 2018).

[48]    Courts have found the use of taser against an arrestee who is actively and physically resisting arrest does not constitute an excessive use of force. The Sixth Circuit Court of Appeals, concisely concluded: "[c]ases from this circuit and others, before and after May 2007, adhere to this line: If a suspect actively resist arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." Hagans v. Franklin Cty. Sheriff's Office, 695 F.3d 505, 509 (6th Cir. 2012). See also, e.g., Carpenter v. Gage, 686 F.3d 644, 649–50 (8th Cir. 2012) (affirming dismissal of excessive-force claim where plaintiff was tasered after failing to produce hands for cuffing, despite plaintiff's assertion he moved his hands "merely as an effort to breathe").

[49]    For example, in De Boise v. Taser Int'l, Inc., 760 F.3d 892 (8th Cir. 2014), the Eighth Circuit held that the repeated use of taser on an arrestee did not violate the

arrestee's clearly established rights. De Boise suffered from schizophrenia and, on the night of his arrest, became delusional and physically aggressive. Id. at 894. Six officers arrived on the scene, at which time De Boise's mother informed the officers that she had a firearm in the house and that her son was schizophrenic. Id. at 894–95. The officers heard loud noises from inside the house, including screaming, glass breaking, and heavy furniture being thrown, after which De Boise exited the house naked and referred to himself as God. Id. at 895. De Boise initially complied with instructions to lie face down on the ground, but when an officer approached, De Boise jumped to his feet, clenched his fists, and glared at an officer. Id. The officers instructed De Boise several times to lie down, but De Boise refused. Id. The officers tasered De Boise, but he continued to struggle and ignore commands. Id. The officers tasered De Boise eight times and used a taser on him in drive-stun mode twice, and ultimately injected him with a sedative to subdue him. Id. at 895–96. De Boise suffered cardiac arrest and died. Id. at 896. The Eighth Circuit explained:

> Although we have determined that non-violent, non-fleeing subjects have a clearly established right to be free from the use of tasers, [ ] we have yet to determine whether a violent subject, acting aggressively toward officers, has a clearly established right to be free from multiple tasings.... Indeed, in 2008, case law related to the use of tasers was still developing.... And, Appellants point to no previous case that could be said to have clearly established the unconstitutionality of the officers' actions here. Accordingly, the state of the law would not have placed "an officer on notice that he must limit the use of his taser in certain circumstances, even though the subject continues to struggle and resist."

[50]     De Boise, 760 F.3d at 897 (internal citations omitted). See also Carpenter, 686 F.3d at 649–50 (holding that officers did not use excessive force when they twice used a taser against an arrestee who "continued to resist" arrest by physically fighting and "bucking" in an effort to throw off a deputy attempting to subdue him); Cook, 582 F.3d at

849–52 (finding officers use of a taser on a passenger who got out of his wife's vehicle to confront an officer and did not obey commands was not an excessive use of force); Clark v. Ware, 873 F. Supp.2d 1117, 1122–1123 (E.D. Mo. 2012) (holding that, in cases where plaintiffs are tasered "while actively resisting arrest by physically struggling with, threatening, or disobeying officers," courts either find that no constitutional violation occurred or that the right not to be tasered while resisting arrest was not clearly established when the incident happened)

[51]   Cases have also addressed the use of tasers in the so-called drive-stun mode. Generally, the courts have found law enforcement officers can use a taser in drive-stun mode, even against a passively resisting suspect in order to obtain compliance.

[52]   For example, in Abbott v. Sangamon Cty., Ill., 705 F.3d 706, 728 (7th Cir. 2013) (holding that police officer did not violate clearly established law in 2007 by using a taser in drive-stun mode several times until the handcuffed plaintiff, who was actively resisting arrest, was subdued); Buckley v. Haddock, 292 Fed. Appx. 791, 792–93, 796 (11th Cir. 2008) (unpublished) (finding no excessive force when officer used taser in drive-stun mode against a handcuffed subject who was lying on the ground, refusing to stand and crying).

[53]   The evidence in this case reveals no genuine issue of material fact concerning whether the officers applied reasonable force.

[54]   **Officer Hamilton and Sergeant Raugust**: The first question is whether there is a genuine issue of material fact about whether Officer Hamilton and Sergeant Raugust used excessive force in the use of a taser while attempting to place Prudente under arrest. Considering the totality of the circumstances in the light most favorable to Plaintiffs,

this Court should find there is no genuine issue of material fact, and that Officer Hamilton and Sergeant Raugust did not use excessive force.

[55]     After Officer Hamilton and Sergeant Raugust arrived, a tense, uncertain, and rapidly evolving and uninterrupted physical struggle ensued as Officer Hamilton and Sergeant Raugust fought with Prudente to place him in custody. Prudente was actively resisting arrest by running away from the officers, biting, and hitting Sergeant Raugust, flailing arms and kicking legs, and noncompliance with commands. The circumstances of this case involved a fluid and continuous resistance by Prudente to any efforts to place him under arrest. The amount of physical resistance ebbed and flowed throughout the struggle, but he was never compliant and never passive and never obeyed the deputies' commands.

[56]     Officer Hamilton and Sergeant Raugust were justified in using a taser when they encountered Prudente. And Prudente continued to resist arrest, sometimes more aggressively than other times, but always resisting. Once officers are justified in using force, as they were here, they can continue to use force until the threat has been neutralized. Plumhoff v. Rickard, 572 U.S. 765, 777 (2014) ("It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended."). Although Officer Hamilton and Sergeant Raugust attempted to use a taser against Prudente a handful of times, it does not establish how many times they were successful. When Officer Hamiton first attempted to drive stun Prudente, she was unable to hold the taser on his body due to his resistance. The next two attempts did not faze Prudente. Likewise, Sergeant Raugust attempted to use his taser but missed. Moreover, there is no evidence that

Officer Hamilton and Sergeant Raugust used their tasers against Prudente after he was handcuffed.

[57]    Officer Hamilton and Sergeant Raugust's use of force in these circumstances was objectively reasonable.

[58]    **Lieutenant Czapiewski**: Lieutenant Czapiewski played a very minor role in subduing Prudente. When he arrived on scene, Lieutenant Czapiewski observed Prudente on the ground screaming and kicking his legs. He assisted in handcuffing Prudente. Minimal force – at best – was used by Lieutenant Czapiewski. Force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest. Brown v. City of Golden Valley, 574 F.3d 491, 499 (8th Cir. 2009)). Accordingly, Lieutenant Czapiewski was entitled to use the force necessary to effect the arrest. See Carpenter, 686 F.3d at 650.

[59]    **Officer Hanson**: Officer Hanson arrived on scene after the ambulance had already been called and the altercation ceased. There is no evidence he was near Prudente or even came into contact with him. No force was used by Officer Hanson.

[60]    **Officer Scherr**: He assisted Lieutenant Czapiewski in keeping Prudente under control and on his side.  Officer Scherr contacted the ambulance and once Prudente became unresponsive, Officer Scherr began a sternum rub. Like Lieutenant Czapiewski, little to no force was used by Officer Scherr.

[61]    Although Plaintiff's may argue that because Prudente had pre-existing medical conditions which made such tactics unreasonably dangerous. Prudente's pre-existing medical conditions have no bearing. First, the taser was, at most, a contributory factor in Prudente's death, which his death primarily resulted from his long-term

methamphetamine use and underlying diagnoses. This is not the type of causal linkage that could lead a reasonable jury to conclude that using a taser on Prudente constituted an excessive use of force. Zubrod v. Hoch, 232 F. Supp. 3d 1076, 1093 (N.D. Iowa 2017), aff'd, 907 F.3d 568 (8th Cir. 2018)

[62]    Plaintiffs might emphasize that Prudente had a history of mental illness and that made the officers use of force excessive. Case law is clear that officers can continue to use force even against someone they know to be mentally ill or on drugs when the person nevertheless continues to actively resist arrest. Hayek v. City of St. Paul, 488 F.3d 1049, 1055 (8th Cir. 2007) ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled person."); Hassan v. City of Minneapolis, Minn., 489 F.3d 914, 919 (8th Cir. 2007) (holding that even if officers knew the suspect was mentally ill, the suspect's "mental state does not change the fact he posed a deadly threat to the officers and the public" justifying the use of force).

[63]    A reasonable officer would not have understood the action in question to constitute excessive force. Thus, the law was not clearly established, and the five named officers are entitled to qualified immunity.

## ii.    Deliberate Indifference.

[64]    Plaintiffs allege that the Defendants acted with deliberate indifference to Prudente's medical needs. Such allegations are analyzed under the Eighth Amendment deliberate indifference standard. See Carpenter v. Gage, 686 F.3d 644, 650 (8th Cir. 2012). A plaintiff claiming deliberate indifference must establish objective and subjective components. McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir.2009). "The objective

component requires a plaintiff to demonstrate an objectively serious medical need. The subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need." Id.

[65]   To be objectively serious, a medical need must have been "diagnosed by a physician as requiring treatment" or must be "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Barton v. Taber, 820 F.3d 958, 964 (8th Cir. 2016).

[66] In order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the person's health. Vaughn v. Gray, 557 F.3d 904, 908 (8th Cir.2009) (internal quotation omitted). This onerous standard requires a showing "more than negligence, more even than gross negligence," Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir.2008), but less than "purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." Schaub v. VonWald, 638 F.3d 905, 914–15 (8th Cir.2011).

[67]   Prudente fled a lawful traffic stop; however, Sergeant Raugust was able to catch up. As Sergeant Raugust pulled up to Prudente's residence, Prudente began yelling at him. As Prudente was trying to enter his home, Sergeant Raugust instructed him to stop. He pulled out his taser and aimed it at Prudente. Sergeant Raugust continued to yell and Prudente took off running. Sergeant Raugust gave chase and ran after him, eventually deploying his taser. He believed he missed, and the taser had no effect. He continued to chase Prudente.

[68]    Officer Hamilton arrived next and followed the sound of the commotion and began chasing Prudente as well. Officer Hamilton pulled her taser and pointed it at him. She instructed him to get to the ground. At this time, Prudente was pacing and yelling between Officer Hamilton and Sergeant Raugust.

[69]    Sergeant Raugust attempted to gain control of Prudente and bring him to the ground. Prudente poked Sergeant Raugust in the eye and dislodged a contact. Prudente also bit Sergeant Raugust's arm drawing blood. Sergeant Raugust was able to pull his arm out of his mouth and Prudente spun into him and stumbled. As the wrestling continued, he could hear Officer Hamilton giving commands and trying to gain control.

[70]    Prudente would not comply with any verbal commands, so Officer Hamilton drive stunned him in the butt. However, Prudente was moving so much she was unable to hold the taser on to him. Officer Hamilton then stood back to get a clear shot. She deployed her taser into his back side which did not seem to faze Prudente. Officer Hamilton also tried to grab his right side, but Prudente was swinging his arms. Ultimately Officer Hamilton and Sargeant Raugust were able to get Prudente on the ground, but he continued to resist by kicking and trying to roll around. Other officers arrived on scene. Lieutenant Czapiewski and Sergeant Raugust were able to grab his arms and Officer Hamilton cuffed him.

[71]    Sergeant Raugust then got up and grabbed several items that were torn off his uniform. He then noticed that Prudente became quiet and was turning purple in his face. Lieutenant Czapiewski advised dispatch to send out an ambulance to have Prudente medically cleared. The officers removed the handcuffs and began life saving measures. Specifically, Officer Hauck began a sternum rub to which Prudente did not respond.

Officer Scherr began cardiopulmonary resuscitation (CPR). Officer Hauck also administered Narcan.

[72]    When the ambulance arrived, officers asked Prudente's parents' what medications he is on and about health issues. They indicated that he has Schizophrenia and other mental health issues. They said that the only drugs Prudente takes are those proscribed to him.

[73]    The results of the autopsy concluded the death of Prudente was due to Excited Delirium as a result of methamphetamine use and underlying diagnoses. There was no evidence from the autopsy of excessive use of force.

[74]    When the officers arrived on scene, Prudente was conscious, communicative, able to walk and run, and pert near successfully out-wrestled more than one law enforcement officer. He continued to resist arrest essentially up until he was handcuffed. Prudente's behavior failed to demonstrate an objectively serious medical need, nor did he display any noticeable symptoms of a serious medical need. Barton, 820 F.3d at 964. The subjective component of deliberate indifference is not met from the time the officers arrived to Prudente being handcuffed.

[75]    For purposes of this motion, Prudente turning purple and becoming limp constitutes objectively serious medical need. The entitlement of the officers to qualified immunity thus turns on whether they knew of the serious medical need and were deliberately indifferent to it. The evidence does not support a finding that the five officers were deliberately indifferent in responding to Prudente's serious medical need. The officers did not ignore him. The moment Sergeant Raugust observed Prudente's skin color, the officers took immediate and affirmative action in response to his medical needs

by calling an ambulance, removing his handcuffs, performing a sternum rub and CPR as well as administering Narcan. Frankly the officers went above and beyond as caselaw supports that calling the paramedics alone and staying by Prudente's side as he was transported, shows they did not "deliberately disregard[]" his medical needs. Hanson as Tr. for Layton v. Best, 915 F.3d 543, 549 (8th Cir. 2019). While the Plaintiff's may disagree with the reasonable steps the officers took, it does not follow, however, that an unreasonable response—i.e., a negligent response—is sufficient to establish liability. Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009). Moreover, the Plaintiffs cannot establish that the officers had a mental state akin to criminal recklessness. Vaughn, 557 F.3d at 908. Only in cases when the officers did nothing and ignored the obvious need for medical care was qualified immunity denied. This is not the case here. See Long v. Nix, 86 F.3d 761, 765 (8th Cir.1996) (The failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless officials knew that the condition created an excessive risk to health and then failed to act on that knowledge)).

[76]    Because neither prong of the deliberate indifference standard is met, the officers did not violate Prudente's constitutional right to medical care and therefore are entitled to qualified immunity.

### iii.    Qualified Immunity – Clearly Established Authority.

[77]    Even if this Court finds that the five named officers used excessive force, they are still immune from suit if it was not clearly established at the time of their conduct that it constituted a violation of Prudente's constitutional rights.

[78]    Qualified immunity "shields [a] government official from liability in a § 1983 action unless the official's conduct violates a clearly established right of which a reasonable person would have known." Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009). The government official claiming the protection of qualified immunity must first establish that he was acting within his discretionary authority. Livingood v. Meece, 477 N.W.2d 183, 192 (N.D. 1991). There is no dispute that all five officers in this case were acting within their discretionary authority. The burden then shifts to the plaintiff, who must satisfy a two-part test in order to avoid the application of qualified immunity. To overcome the defense of qualified immunity, the Plaintiffs must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation. Howard, 570 F.3d at 988.

[79]    Having concluded under the first part that there was not a violation of Prudente's constitutional rights, the Court turns to the second part of the inquiry. The pertinent question in the second part of the inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Shekleton v. Eichenberger, 677 F.3d 361, 367 (8th Cir. 2012) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

[80]    This Court should find that no reasonable officer would have clearly known that using a taser against Prudente in the situation they faced was unlawful. A law enforcement officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the [officer's] shoes would have understood that he was violating it.... In other words, 'existing precedent must

have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" Plumhoff, 572 U.S. at 779 (internal citations omitted). Therefore, "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." Taylor v. Barkes, 575 U.S. 822, 825 (2015). Neither Supreme Court precedent, nor Eighth Circuit precedent, has sufficiently defined when or how many times a law enforcement officer may use a taser on a person resisting arrest. Indeed, the Eighth Circuit has recognized this area remains undefined. De Boise, 760 F.3d at 897 ("[W]e have yet to determine whether a violent subject, acting aggressively toward officers, has a clearly established right to be free from multiple tasings.").

[81]   Accordingly, this Court should find that the five named officers are entitled to qualified immunity.

### C.   Municipal Liability – City of Mandan.

[82]   Plaintiffs also bring a § 1983 against the City of Mandan. "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. Therefore, when courts evaluate a § 1983 claim against a municipality, they must apply "rigorous standards of culpability and causation ... to ensure that the municipality is not held liable solely for the actions of its employees." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 405, (1997); accord Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable

for the unconstitutional conduct of their subordinates under a theory of respondeat superior.").

[83]     A municipality may be liable under § 1983 where "the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." Corwin v. City of Independence, 829 F.3d 695, 699 (8th Cir. 2016) (citations omitted). Plaintiffs rest their claims for municipal liability on the ground that the City of Mandan failed adequately to train, supervise, and control its officers. Specifically, that the City of Mandan "Fail[ed] to adequately train, supervise, and control employees in the dangers of repeated Taser shocks and positional asphyxia, including, without limitation, the use of potentially lethal tactics, including multiple Taser shocks followed by chest compression, for the taking into custody of persons such as plaintiff's decedent, who may have pre-existing medical conditions which make such tactics unreasonably dangerous."

[84]     The United States Supreme Court has held "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." City of Canton, Ohio v. Harris, 489 U.S. 378, 387 (1989). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. at 388. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. 51 (2011). To establish a failure to train claim, a plaintiff must show that the defendant had notice its procedures were inadequate and likely to result in a violation of constitutional rights. See City of Canton, 489 U.S. at 396. A failure to train claim may also arise from a

pattern of constitutional violations that put the municipality on notice its employees' responses to a regularly recurring situation are insufficient to protect the constitutional rights of its citizens. Id. at 397; see also Thelma D. ex rel. Delores A. v. Board of Educ. of City of St. Louis, 934 F.2d 929, 934–35 (8th Cir.1991).

[85]    Under a § 1983, "a claim for failure to supervise requires the same analysis as a claim for failure to train." Robinette v. Jones, 476 F.3d 585, 591 (8th Cir.2007) (citing Liebe v. Norton, 157 F.3d 574, 579 (8th Cir.1998)). Neither claim can succeed without evidence the municipality "[r]eceived notice of a pattern of unconstitutional acts committed by [its employees]." Parrish v. Ball, 594 F.3d 993, 1002 (8th Cir.2010).

[86]    The claim in this case—that police officers were inadequately trained in diagnosing the symptoms of illness—falls far short of the kind of "obvious" need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city. City of Canton, 489 U.S. at 396–97. Moreover, Plaintiff's failure to train and supervise claims are fundamentally flawed because the officer's conduct did not result in an unconstitutional deprivation of Prudente's rights. As noted above, the Eighth Circuit has been clear in holding that knowledge of a disability cannot foreclose officers from protecting themselves or the general public when faced with a threat. Sok Kong Tr. for Map Kong v. City of Burnsville, 960 F.3d 985, 993 (8th Cir. 2020). In Sok Kong, the Eighth Circuit found that the use of deadly force against a mentally impaired man (high on meth) was reasonable even though the police department's "training" and "policy" "advised that 'taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis.'" Id. The Eighth Circuit further explained that "[e]ven if

officers 'created the need to use' deadly force by trying to disarm a mentally ill person," they were still entitled to use reasonable force to subdue the suspect. Id. Furthermore acting contrary to training "does not itself negate qualified immunity ... so long as a reasonable officer could have believed that his conduct was justified." City of San Francisco v. Sheehan, 575 U.S. 600 (2015). See generally Davis v. Scherer, 468 U.S. 183 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); Cole v. Bone, 993 F.2d 1328, 1334 (8th Cir. 1993) (same, for police department policy).

[87]    Because Plaintiff's have failed to allege liability pursuant to Monell, count one against the City of Mandan fails as a matter of law. Finally, the Court should also dismiss Plaintiff's punitive damages claim against the City of Mandan as punitive damages are not available against a municipality. Graham, 473 U.S. at 167 n.13 (1985); City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981).

**3.     42 U.S.C. § 1983 Claim for Survival Action – All Defendants.**

[88]    It is well settled that a plaintiff's cause of action under s 1983 survives for the benefit of the estate if the applicable state law creates a right of survival. Pritchard v. Smith, 289 F.2d 153, 157 (8th Cir. 1961); see also Black v. Cook, 444 F. Supp. 61, 64 (W.D. Okla. 1977).

[89]    Under North Dakota Law, if an injury giving rise to liability occurs before a decedent's death, then the claim survives the decedents estate. N.D.C.C. § 28-01-26. A survival action is merely a continuation of a claim the deceased would have been entitled to bring had he not died. The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action, and that the

plaintiff meets the state's requirements for bringing a survival action. First, the Plaintiffs here do not meet the states requirements. Pursuant to N.D.C.C. § 28-01-26, only a person's representative may commence a survival action. As such, Sandra Prudente and John Prudente Sr. lack standing to pursue this claim.

[90]    While Cody Prudente as representative of Prudente's estate may have standing, her survival action claim still fails as a matter of law. Cody Prudente has the burden to show that the wrongdoing or negligence of another person led to the injuries suffered by the victim. Plaintiff claims that the excessive force and acting with deliberate indifference to Prudente's medical needs led to Prudente's death. As thoroughly discussed in Section 2(B)(i)-(ii) supra, the Plaintiffs are unable to meet the prongs of the deliberate indifference standard and the officer's applied force was reasonable. Because there were no constitutional violations wrongdoing, or negligence on the part of the City of Mandan and its five named officers, the survival action claim fails as a matter of law and should be dismissed.

**4.    42 U.S.C. § 1983 Claim for Deprivation of Rights of Plaintiff's to Familial Relationship with Decedent – All Defendants.**

[91]    The Plaintiff's third claim for relief is a claim for deprivation of the right to a familial relationship. Pleading a plausible familial relationship claim under § 1983 requires an allegation that the state action was intentionally directed at the familial relationship. See Harpole v. Arkansas Dep't of Human Servs., 820 F.2d 923, 927–28 (8th Cir. 1987) ("Protecting familial relationships does not necessarily entail compensating relatives who suffer a loss as a result of wrongful state conduct, especially when the loss is an indirect result of that conduct."), favorably citing Ortiz v. Burgos, 807 F.2d 6, 8–9 (1st Cir. 1986) (noting Supreme Court substantive-due-process cases protect the right to

make certain private family decisions, such as whether to bear children, and deal with governmental attempts to directly affect the parent-child relationship, such as terminating parental rights, but "[t]he Court has never held that governmental action that affects the parental relationship only incidentally ... is susceptible to challenge for a violation of due process"). See also Reasonover v. St. Louis Cty., 447 F.3d 569, 585 (8th Cir. 2006) (rejecting familial-association claim where plaintiff "present[ed] no evidence that defendants had an intent to interfere with the relationship between [plaintiff] and her daughter"); Singleton v. Cecil, 176 F.3d 419, 423 (8th Cir. 1999) (en banc), aff'g in pertinent part 133 F.3d 631, 635 (8th Cir. 1998) ("A defendant can be held liable for violating a right of intimate association only if the plaintiff shows an intent to interfere with the relationship."), quoting Morfin v. Albuquerque Pub. Sch., 906 F.2d 1434, 1440 (10th Cir. 1990).

[92]    Here, the Plaintiff's did not allege in their Complaint, nor can they show that the altercation between law enforcement and Prudente as well as the resulting death was directed at their relationship with Prudente. This forecloses their claims. Gorman v. Rensselaer Cty., 910 F.3d 40, 47–48 (2d Cir. 2018) ("Based on the Supreme Court's directive that only deliberate conduct implicates due process, we join the consensus view of the circuit courts: a claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship."), citing Daniels v. Williams, 474 U.S. 327, 331 (1986) ("Historically, th[e] guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property."); Russ v. Watts, 414 F.3d 783, 789–90 (7th Cir. 2005) (en banc) ("Under any

standard, finding a constitutional violation based on official actions that were not directed at the parent-child relationship would stretch the concept of due process far beyond the guiding principles set forth by the Supreme Court.").

[93]   It is undisputed that Officer Hamilton conducted a lawful traffic stop to which Prudent was notified of a warrant for his arrest. Prudent subsequently fled the traffic stop. Officer Hamilton and Sergeant Raugust followed Prudente to his home to execute the arrest warrant. Prudente resisted arrest, failed to comply with officer commands, hit and bit an officer. Any use of force or actions taken by the responding law enforcement officers was solely in reaction to Prudente's behavior and was in no way, shape, or form intentionally directed at the familial relationship.

[94]   Accordingly, count three of Plaintiff's Complaint should be dismissed as a matter of law.

**5.   Assault and Battery – All Defendants.**

[95]   Plaintiff's Fourth Claim for Relief is for assault and battery. For the same reasons as heavily discussed in the excessive force claims, there exists no genuine dispute of material fact to cut against a finding that the City of Mandan and its five police officers were clearly justified in using force.  See Dundon v. Kirchmeier, 577 F. Supp. 3d 1007, 1067 (D.N.D. 2021) (citing to Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010) ("Where a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, our determination of the reasonableness of the force used under § 1983 controls our determination of the reasonableness of the force used under the common law assault and battery claims.")).

[96]    Accordingly, the Defendants are entitled to summary judgment on Plaintiff's state law assault and battery claim.

**6.    Police Negligence.**

[97]    To establish a prima facia case of negligence, the plaintiff must prove that: (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the breach was the proximate cause of the plaintiff's injuries. <u>Lovett ex rel. Lovett v. Union Pac. R.R. Co.</u>, 201 F.3d 1074, 1083 (8th Cir.2000).

[98]    Here, the Plaintiff's assert that the Defendant's owed Prudente and Plaintiffs a duty of due care, and that duty was breached in that defendants' negligence and failure to exercise due care in dealing with the decedent proximately caused his death. To prevail on their negligence claim, Plaintiff must show that the Defendant's alleged breach was the cause of Prudente's death to which they cannot.

[99]    The results of the autopsy concluded the death of Prudente was due to Excited Delirium as a result of methamphetamine use and underlying diagnoses. There was no evidence from the autopsy of excessive use of force.

[100]  Because the Plaintiffs cannot satisfy the causational element, their police negligence claim fails as a matter of law.

(Remainder of this page intentionally left blank.)

## CONCLUSION

[101]   For   the   foregoing   reasons,   Defendants   respectfully   request   that   this   Court GRANT  Defendant's Motion for Summary Judgment dismissing this action.

Dated this 16th day of October, 2023.

KING LAW PC
*Attorneys for Defendants*
101 Slate Drive, Suite 4
Bismarck, ND 58503
701-712-2676
lking@KingLawND.com


By:   /s/ Lawrence E. King_____
Lawrence E. King (ID #04997)