**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

Cody Prudente, as personal representative )
of the estate of John Prudente, Jr., deceased; )
Sandra Prudent; and John Prudente, Sr. )
                                    )
           Plaintiffs, )
                                    )
         v. )
                                      )
Mary Hamilton, individually and in her )
official capacity as a City of Mandan Police )
Officer; Joshua Scherr, individually and in )
his official capacity as a City of Mandan )
Police Officer; Dominic Hanson, )
individually and in his official capacity as a )
City of Mandan Police Officer; Peter )
Czapiewski, individually and in his official )
capacity as a Lieutenant of City of Mandan )
Police; David Raugust, individually and in )
his official capacity as a Sergeant of City )
of Mandan Police; and the City of Mandan, )
                                    )
           Defendants. )

**ORDER GRANTING**
**DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

Case No. 1:22-cv-024

---

         Before the Court is the Defendants' motion for summary judgment filed on July 2, 2024.  See

Doc. No. 46.  The Plaintiffs filed a response in opposition to the motion on August 2, 2024.  See

Doc. No. 49.  The Defendants filed a reply brief on August 23, 2023. See Doc. No. 52.  For the

reasons set forth below, the motion is granted.


**I.**      **BACKGROUND**

         This case arises out of a traffic stop that occurred on February 8, 2020, in Mandan, North

Dakota.  The stop was conducted by Mandan Police Officer Mary Hamilton.  The driver of the

vehicle Officer Hamilton pulled over was John Pudente, Jr. ("Prudente"). Mandan Police Sergeant David Raugust assisted Officer Hamilton with the traffic stop. Prudente fled the scene of the traffic stop in his vehicle, traveling just a few blocks away to the home of his father (John Prudente, Sr.) where the two lived. Sergeant Raugust and Officer Hamilton pursued Prudente and located him in the yard at his father's home. Prudente resisted arrest and fought with the officers. Tasers were deployed. Lieutenant Peter Czapiewski, Officer Brandon Hauck, Officer Joshua Scherr, and Officer Dominic Hanson, all of the Mandan Police Department, also arrived on the scene and assisted with the arrest of Prudente. Several bystanders were also on scene including Prundente's father and his mother (Sandra Prudente), although Prundente's mother was not on the scene until just after he passed away. After being subdued and handcuffed, Prudente became unresponsive. Medical assistance was rendered and emergency services summoned. Prudente was later pronounced deceased at a local hospital. An autopsy determined the cause of death was excited delirium due to methamphetamine poisoning and schizophrenia. No criminal charges were filed against any of the police officers involved in the arrest. This federal civil rights action alleging excessive force, deliberate indifference, and other claims was filed on February 8, 2022.

### A.   <u>Summary Timeline of Events – February 8, 2020:</u>

4:45 p.m.:   Officer Hamilton conducted a traffic stop of a gold Ford Fusion bearing North Dakota license plate 578 BWD, that was being operated by Prudente. The reason for the stop was expired registration tags. During the traffic stop, it was confirmed that Prudente had an active arrest warrant out of Bismarck, North Dakota for an unpaid parking ticket.

4:55 p.m.:   Officer Hamilton and Sergeant Raugust approached Prudente's vehicle. Officer Hamilton advised Prudente of the warrant for his

2

arrest.  Prudente began arguing with Officer Hamilton and stated he was not going to jail.  Prudente tried to explain that the warrant was for his father.

4:56 p.m.:      After being instructed to exit the vehicle, Prudente fled from the traffic stop in his vehicle.  Prudente drove to his father's home at 202 7th Ave. Southwest approximately 0.2 miles from the scene of the traffic stop.

4:57 p.m.:      Sergeant Raugust and Officer Hamilton arrived at 202 7th Avenue Southwest in Mandan.  Sergeant Raugust arrived first.  Officer Hamilton arrived shortly thereafter.  The gold Ford Fusion was parked in the driveway of the residence.  Upon arrival, Officer Hamilton exited her vehicle, could hear that a taser was being deployed.  Sergeant Raugust was already in a confrontation with Prudente when Officer Hamilton arrived on scene. Sergeant Raugust and Officer Hamilton confronted Prudente and attempted to place him in custody.  Prudente's father was present outside the residence.  A physical confrontation occurred as Prudente resisted. During the altercation, both Sergeant Raugust and Officer Hamilton deployed their Tasers as they attempted to arrest Prudente.  During the altercation, Sergeant Raugust was gouged in the eye and bitten by Prudente.

5:00 p.m.:      Lieutenant Czapiewski arrived on scene and assisted Sergeant Raugust and Officer Hamilton with handcuffing Prudente.  Other officers began arriving on scene at this time.

5:01 p.m.:      Officers handcuffed Prudente.  Prudente continued to yell and struggle with officers after being handcuffed and placed on his side.

5:02 p.m.:      Officers on scene requested Metro Area Ambulance respond to the scene to evaluate Prudente.  Metro Area Ambulance and Mandan Fire were dispatched to the scene.

5:03 p.m.:      Prudente's mother arrived on scene.

5:05 p.m.:      Prudente became unresponsive.  Officers requested the ambulance respond "code 3" and advised that Prudente was unresponsive and CPR was being administered by officers.

5:07 p.m.:      Officer Hauck obtained an AED and placed the pads on Prudente.  No shock was advised.  Officer Scherr and Officer Hauck continued to

3

administer CPR to Prudente.

5:08 p.m.:    Members of the Mandan Fire Department arrived on scene and assisted with performing life saving measures.  Officer Hauck administered Narcan at the direction of firefighters.

5:10 p.m.    Metro Area Ambulance personnel arrived on scene and began performing life saving measures on Prudente.

5:17 p.m.:    Prudente was placed in the back of the ambulance.

5:26 p.m.:    The ambulance left the scene to transport Prudente to Sanford Hospital.

5:30 p.m.:    The Mandan Fire Department left the scene.

5:35 p.m.:    The ambulance arrived at Sanford Hospital in Bismarck with Prudente where he was later pronounced deceased.

8:32 p.m.:    Metro Area Ambulance personnel transported Prudente's body from Sanford Hospital to the state medical examiner's office.

### B.    **Details of Law Enforcement's Involvement**

#### 1.    **Sergeant Raugust**

On February 8, 2020, at approximately 4:45 p.m., Sergeant Raugust was nearing the end of his patrol shift.  Officer Hamilton had radioed that she was stopping a vehicle.  Dispatch notified the officers that Prudente had a warrant for his arrest for a $65 unpaid parking ticket issued by Bismarck Police Department.  Sergeant Raugust decided to go to Officer Hamilton's location and assist. When Sergeant Raugust arrived, Officer Hamilton was standing at the driver's side of Prudente's vehicle.   Sergeant Raugust approached the passenger side of Prudente's vehicle, where he donned black leather gloves.

Officer Hamilton informed Prudente of the warrant and he attempted to explain that the

warrant was a mistake, that it was for his father, John Prudente, Sr., and that efforts had been made

to correct the error. When Hamilton asked Prudente to step out of the car, Prudente became upset

and started yelling. When Sergeant Raugust attempted to open the passenger door Prudente grabbed

the shifter in his vehicle, put it in drive, and drove off. Sergeant Raugust returned to his patrol

vehicle while Officer Hamilton returned to her patrol vehicle and radioed that Prudente had fled the

stop. Sergeant Raugust drove ahead of Officer Hamilton's patrol vehicle, in pursuit of Prudente.

Prudente did not flee far, approximately 0.2 miles. The officers drove the two blocks to the

residence Prudente had pulled up to. Sergeant Raugust described the incident in detail during his

deposition.

> A.    When I had pulled up, I saw him get out of the vehicle and he was throwing
>        his arms up and yelling profanities and still very, very upset.
>
> Q.    Could you hear what he was saying at that time?
> A.    The F word, and it was hard to hear at that point in time, because he was
>        quite a distance away, but he was yelling – I can't, I guess I couldn't give you
>        quotes or specifics.
>
> Q.    Okay. And, then, what happened then?
> A.    I shouted to him that he needed to come over to me, that he was under arrest,
>        and he refused to come towards me.
>
> …
>
> Q.    Okay. And he just refused to come to you?
> A.    Correct.
>
> Q.    Did he make any attempt to flee further at that point or was he just still
>        standing around his vehicle?
> A.    He had, he walked quickly towards the back of a house.
>
> …
>
> Q.    Okay. And then what?
> A.    He had went to the back porch and had pulled on the door, and I didn't know

at that point if this was his house or just a house he was trying to get into, I had no idea what house this, whose house this was.

Q.    When Mr. Prudente pulled on the door of the house, about how far from him were you?
A.    Maybe 50 to a hundred feet. Maybe.

Q.    And what happened at that point?
A.    I started approaching closer, and I got closer to him, continuing to give commands to come, to come to me.
…
Q.    Was he saying or doing anything in response to your commands to come to him?  Or, I'm sorry, for him to come to you?
A.    It just – I guess, not cooperating and continuing to yell profanities. I'm not sure exactly what, if he said no, I'm not going to, or what, but – (no further response.)

Q.    But he made no attempt to come away from the door?
A.    Correct.

Q.    Okay. What happened at that point?
A.    At that point, as I was getting closer, he took off running.

Q.    Where did he run?
A.    Around the other, back side of the house.

…

Q.    Okay. And so he took off running and went where?
A.    Around the, around the, I guess around to the front of the house.

Q.    Okay. And then what did you do?
A.    I pursued him on foot.

…

Q.    Did he stop?
A.    No. He continued to run.
Q.    Where did he continue running to?
A.    Back around the house and then into the backyard. There was, like, a garage or a shed in the back.

…

6

Q.      Okay. When he ran and made his, essentially, a circle around, what happened
        from there?
A.      You know, I continued to yell for him to stop, stop running. We ran to the
        back shed, garage structure. He had been looking, kind of, over, over his
        shoulder to see where I was, and around, near the shed in the back, he had
        then turned around to, I guess, face me.

…

Q.      Okay. And when Mr. Prudente turned to face you, what happened then?
A.      I yelled commands at him. It appeared to me that he might resist and I had
        pulled my taser out.
Q.      And this is probably a silly question, but what about his appearance made you
        think that he would resist?
A.      You know, he looked angry. Not, I guess, in my training and experience, not
        somebody that was going to be willing in that, in that moment, to be done.

…

Q.      And so you had your Taser out, and what happened from there?
A.      Right when he had turned to kind of face me, he wasn't following commands.
        I deployed the Taser right as he had turned around and began running again.

Q.      Okay. Did you warn him that you were going to deploy the Taser?
A.      I don't remember if I said - - I don't remember exactly the verbiage I used in
        that moment.

Q.      Okay. And, but he was facing you, so, you know, theoretically, he could see
        that you were - -
A.      Yes.

Q.      -- holding your Taser. Okay. And so you did deploy your Taser?
A.      Yes.2

Q.      And not - - there's two modes, right? There's stun and then there's the
        probes?
A.      Correct.

Q.      Okay. And I'm assuming that you used the probes?
A.      Correct.

…

Q.      Okay. So did both probes hit Mr. Prudente?
A.      No.

Q.      Did, was it a complete miss, or - -
A.      I believe it was a complete miss, yeah.

Q.      Okay. And what happened then?
A.      He continued to run and I continued to pursue. Put my Taser back into its
        holster as I was making my way back through the yard again to the front yard.

Q.      And so at some point Mr. Prudente takes off running, you know, he's facing
        you and then he takes off running again, then, right?
A.      Correct.

Q.      Okay. Did he take off running before or after your deployed your Taser?
A.      I believe the reason that, I think, that I missed is he had, he had turned to run
        at about the same moment I deployed.

Q.      Okay.
A.      So he had been facing me and as he turned away to run, in that moment I
        deployed and missed him.

Q.      Okay. And so he continued to run. Where did he run to this time?
A.      To the front yard.

…

Q.      Okay. Once he got to the front yard, your pursued, correct?
A.      Yeah. I continued to, yes, I continued to chase him on foot.

Q.      Did you attempt to deploy your Taser again?
A.      No.

Q.      Did he stop in the front yard?
A.      Yes. By some cars.

Q.      Okay. And, then, at that point what happened?
A.      He turned to face me again.

Q.      And then what happened?
A.      At that point in time I closed distance and took ahold of him to try to place
        him under arrest.

8

Q.    And how did you take ahold of him, where did you grab him?
A.    I believe his arm.

…

Q.    So after you had grabbed his arm, what happened?
A.    I guess it became a struggle. I tried to pull him into handcuffs. I did have handcuffs out, but he started clawing at me and fighting with me.

Q.    Okay. When you say you tried to pull him into handcuffs, I'm assuming, like, the position to handcuff him in the back?
A.    Correct.

Q.    Okay. And both of you were still standing at this point?
A.    Yes.

Q.    And he began clawing you?
A.    In, yes, in my face.

…

Q.    And then what happened?
A.    He, when he had grabbed ahold of my face, I guess I had realized that he had got his fingers in my eye and pulled the contact out of my, of my eye.

…

Q.    And once he got your contact out, what did you do?
A.    I tried to pull him to the ground.

…

Q.    When you tried to pull him to the ground, what happened?
A.    At some point in time my arm was near, near his head or face, and he had, was able to get the ability to bite my, my left forearm.

…

Q.    Okay. When he bit you, what happened after that?
A.    I pulled my arm out of his mouth in a downward position and I had struck up with a closed fist up towards his face.

…

Q.    Okay. And what happened then?

A.    At that point we were unstable enough where we, we fell down, both of us.

Q.    Okay. Okay. Did one of you fall on top of the other, did you kind of fall down laying next to each other?

A.    I believe it was kind of next to each other, - -

Q.    Okay.

A.     -- if I remember right. It was kind of a, I guess it was a wrestling match for a little bit.

Q.    Okay. And so you struggled on the ground for a while. What happened then?

A.    I, at this point, I made a decision just to hold on. I knew that there was other officers there. Then I, at that point, too, I could hear Officer Hamilton giving commands as well.

…

Q.    After Officer Hamilton was giving her commands, what happened?

A.    I held on, trying to keep him on the ground, mostly so I didn't get anymore damage from either bites, fists. I could hear other officers were starting to pull up on scene.

…

A.    At that point in time the other officers arrived and began giving commands as well. And then they assisted putting handcuffs on Mr. Prudente.

Q.    Which other officers arrived?

A.    Officer Scherr and Lieutenant Czapiewski.

See Doc. No. 46-1.

Sergeant Raugust then got up and retrieved several items that were torn off his uniform during the scuffle. About this time he then noticed that Prudente became quiet and was his face was turning purple. Officers then requested an ambulance, removed the handcuffs from Prudente, and began life saving measures began.

10

2.    **Officer Hamilton**[1]

On February 8, 2020, at approximately 4:50 p.m., Officer Hamilton was parked in her patrol vehicle when she observed Prudente drive by with expired tags. She pulled behind him, activated her lights, and initiated a traffic stop.

Upon approaching Prudente's car, Officer Hamilton asked for Prudente's registration and license. Prudente's license had expired, and he was unable to find any insurance or registration cards. Officer Hamilton returned to her vehicle and had dispatch run a warrant and driver's license check. Dispatch advised that Prudente had an unconfirmed bench warrant through the City of Bismarck for parking citations. Officer Hamilton was informed that Sergeant Raugust was on his way to assist.

Officer Hamilton again approached the driver's side of Prudente's car and advised Prudente of the warrant. Prudente attempted to explain that the warrant was erroneous, that it belonged to his father, John Prudente, Sr., and that efforts had been made to correct the error. Officer Hamilton asked Prudente to step out of the vehicle. At that time, Sergeant Raugust arrived on scene and approached the passenger side of Prudente's vehicle. While standing at the passenger side door of Prudente's vehicle, Sergeant Raugust can be seen putting black leather gloves on. Sergeant Raugust opened the passenger door of Prudente's car. Prudente said something to the effect of he was not going to be arrested and he proceeded to put the car in drive and drove off.

Sergeant Raugust and Officer Hamilton returned to their patrol vehicles. While Sergeant Raugust drives off in pursuit of Prudente, Officer Hamilton notified dispatch that Prudente was

---

[1]Officer Hamilton passed away on February 25, 2024, and was not deposed. Her affidavit is found at Doc. No. 36-4.

fleeing. Shortly after Sergeant Raugust left the scene of the traffic stop, Officer Hamilton followed in pursuit of Prudente. Less than a minute later, Officer Hamilton arrived at the Prudente home, parked, and exited her vehicle. She was unable to see Prudente or Sergeant Raugust. She could hear active Taser deployment coming from the back of Prudente's residence. She then heard yelling. Officer Hamilton then notified dispatch that a Taser was deployed and Prudente was fighting. Officer Hamilton followed the sound and yelled at Prudente to get on the ground. Officer Hamilton pulled her Taser and pointed it at Prudente.

At this time, Prudente was pacing and yelling between Officer Hamilton and Sergeant Raugust. Sergeant Raugust was able to grab Prudente. Prudente would not comply with any verbal commands, so Officer Hamilton drive-stunned him in the buttocks. However, Prudente was moving so much she was unable to hold the Taser on him. Officer Hamilton then stood back in an effort to get a clear shot. She deployed her Taser into Prudente's back side which did not seem to faze him. During this time, Officer Hamilton deployed her Taser twice, once for one second and once for five seconds. Officer Hamilton also tried to grab his right side, but Prudente was swinging his arms. Sergeant Raugust and Prudente fell over, and Officer Hamilton went with them. Prudente was then face down and still resisting.

Prudente was kicking his legs and trying to roll around. Less than half a minute after her second taser deployment, Officer Hamilton deployed her taser for a third time for three seconds. Officer Hamilton again tried to drive stun him, but it had no effect. Other officers approached. Lieutenant Czapiewski and Sergeant Raugust were able to grab Prudente's arms and Officer Hamilton cuffed him.

While the officers were struggling with Prudente, his father was pacing around them and

yelling that Prudente had mental health issues. Lieutenant Czapiewski advised dispatch to send out an ambulance to have Prudente medically cleared. Officer Hamilton observed Lieutenant Czapiewski and Officer Scherr holding onto Prudente, who was lying on his side. Officer Scherr then said that Prudente was having medical issues and said to run code 3 (Emergency - Proceed immediately with lights and siren). Lieutenant Czapiewski removed Prudente's handcuffs. Officer Hauck began a sternum rub to which Prudente did not respond. Officer Scherr began CPR. The ambulance then arrived.

### 3.    <u>Lieutenant Czapiewski</u>

Lieutenant Czapiewski heard on the radio that Officer Mary Hamilton was initiating a traffic stop. Dispatch advised Officer Hamilton that Prudente had a warrant for his arrest. Officer Hamilton later radioed that the vehicle being operated by Prudente was fleeing but that they were not pursuing. Lieutenant Czapiewski heard that the vehicle was possibly headed home, so he began to head that way.

Upon arrival at the residence, Lieutenant Czapiewski heard yelling from behind the residence. He observed Prudente on the ground screaming and kicking his legs. Lieutenant Czapiewski was unable to understand what Prudente was saying. Sergeant Raugust was to Prudente's left holding him down, and Prudente's father was holding down Prudente's right side. Lieutenant Czapiewski instructed Prudente's father to get up and out of the way. Lieutenant Czapiewski was struggling to get Prudente's arm behind his back and Officer Hamilton was able to get one cuff on.

After Prudente was handcuffed, Lieutenant Czapiewski placed Prudente in a recovery

position (on his side).  Lieutenant Czapiewski observed blood around Prudente's mouth and then called the ambulance.  Prudente was still conscious and continued to kick and scream.

Prudente's parents were yelling that Prudente has mental health issues.  Prudente eventually stopped moving and went limp and appeared to have passed out.  Lieutenant Czapiewski then checked for a pulse and did not find one.  He instructed Officer Scherr to remove Prudente's handcuffs and to begin CPR.

**4.    Officer Brandon Hauck**[2]

Officer Hauck responded to backup Officer Hamilton on the traffic stop that she advised was fleeing.  Officer Hauck heard the radio advise Hamilton of the warrant.

Sergeant Raugust radioed the location and Officer Hauck proceeded to the location.  In route, Officer Hauck heard what he believed to be Officer Hamilton struggling with something or someone.  Officer Hamilton and Sergeant Raugust were not answering radio traffic.

When Officer Hauck arrived, he exited his vehicle with his patrol rifle.  He observed Prudente's father hunched over near Sergeant Raugust's right side.  Sergeant Raugust, Officer Hamilton and Lieutenant Czapiewski were surrounding Prudente attempting to take him into custody.  Prudente was laying down.  Officer Hauck could not recall the position of the officers, or whether any of them were kneeling on Prudente:

> Q.    Okay. And when you came upon the subject, what did you observe?
> A.    I observed those three officers that I previously stated to be around the subject, as well as a man later identified as John Prudente, Sr., to be on the right side of Sergeant Raugust. I asked him to step back.

---

[2]Officer Hauck is not a named defendant in the case.

Q.    Okay. Where was Officer Hamilton in relation to the subject when you arrived?

A.    That I don't recall.

Q.    Do you recall where Officer Raugust was, or Sergeant Raugust?

A.    No, I don't.

…

Q.    Do you recall where Lieutenant Czapiewski was relative to the subject?

A.    No, I don't.

Q.    Okay. But you knew that, that John Prudente, Sr., was to the right of Officer Raugust?

A.    Yes.

Q.    Okay. And they were all kneeling around him?

A.    I don't recall how they were standing around him. I just remember that those three were around him.

Q.    Do you recall whether any of them were kneeling on him?

A.    I don't recall.

Q.    Okay. Was John Prudente, Jr., was he handcuffed at that time?

A.    That I don't recall either.

Q.    Do you recall whether he was laying supine or prone?

A.    No, I don't.

…

Q.    Okay. When you noticed, or when you returned to the scene and you noticed that John, Jr., was not moving or responsive, was he handcuffed at that time?

A.    I don't exactly recall when the handcuffs were put on, but I do faintly remember him being in handcuffs.

See Doc. No. 46-5, pp. 23-24.

Officer Hauck instructed Prudente's father to back away as he was yelling so he focused on containing John Sr., who eventually agreed to leave the scene. Officer Hauck then turned his attention to Prudente and was advised to return the rifle to the patrol vehicle – which he did.

15

When Officer Hauck returned to the scene, he observed that Prudente was no longer making noise or moving. Officer Scherr began a sternum rub. Officer Hauck then ran to his vehicle and returned with an AED and assisted with CPR. Officer Hauck also administered Narcan.

### 5.  **Officer Dominic J. Hanson**

At the time of the traffic stop, Officer Hanson was at the law enforcement center. He heard on the radio that Prudente had a warrant and began to flee. Officer Hanson then heard that Prudente was fighting so he proceeded to the location.

When Officer Hanson arrived, he observed Prudente was cuffed and actively moving and making noise. He heard Prudente shouting but could not understand what he was saying. Prudente's mother began approaching but Officer Hanson kept her away. Prudente's mother insisted that she could help keep Prudente calm and was allowed to attempt from a distance. Officer Hanson also observed blood on Sergeant Raugust and learned that Prudente had bitten him.

Officer Hanson observed one officer performing a sternum rub. Officer Hauck ran to a patrol vehicle to obtain an AED. Officer Hanson walked Prudente's mother to the street to be further away. Prudente's parents were becoming agitated, so Hanson tried to calm them down.

When the ambulance arrived, the officers asked the parents what medications Prudente was on and about health issues. They indicated that he had Schizophrenia and other mental health issues. They said that the only drugs Prudente was taking were those prescribed to him.

### 6.  **Officer Scherr**

Officer Scherr heard on the radio that Prudente had a warrant and began to flee. Officer

Scherr then proceeded to the location to assist.  While in route, Sergeant Raugust radioed that

Prudente was fighting.  Upon arrival, Officer Scherr saw Officer Hamilton, Officer Hauck,

Lieutenant Czapiewski, and Sergeant Raugust were on scene.  Officer Scherr assisted Lieutenant

Czapiewski in keeping Prudente under control and on his side.  Prudente was screaming and was

difficult to understand.  Lieutenant Czapiewski advised Scherr to contact the ambulance.

Prudente became unresponsive and Officer Scherr began a sternum rub. Officer Scherr

observed that Prudente's face turned bluish/purple and that he did not appear to be breathing.

Officer Scherr uncuffed Prudente and began chest compressions.  He assisted with getting Prudente

loaded into the ambulance. During his deposition, Officer Scherr testified:

> A.    Sergeant Hauck and Lieutenant Czapiewski, Sergeant Raugust, and Detective
> Ternes were all on scene. I, at that time I saw Lieutenant Czapiewski and
> Sergeant Raugust still on the ground with Mr. Prudente. At that time I could
> tell that Sergeant Raugust was pretty gassed from the fight, so I stepped in to
> assist with keeping Mr. Prudente under control.
>
> Q.    When you first arrived on scene and you first saw Mr. Prudente, what was his
> position?
> A.    I don't fully recall the exact position he was in.
>
> Q.    Okay. Do you remember whether he was face down or on his side at that
> time?
> A.    I, honestly, I don't. I don't remember.
>
> Q.    Okay. Do you remember where Sergeant Raugust and, and Lieutenant
> Czapiewski were in relation to the subject's body?
> A.    I, I know that Sergeant Raugust was just right in front of me and then
> Lieutenant Czapiewski was on my, on the right side. But again, I don't
> remember how Mr. Prudente, I don't remember how his body was placed at
> that point. I just know that they had just gotten him handcuffed.
>
> Q.    Okay. So when you say Sergeant Raugust was across from me, he was, like,
> across Mr. Prudente's body, was he in between?
> A.    No. I guess, I guess, I guess how I would explain it is I was facing north from
> the backyard, --

Q.      Okay.
A.       -- I was facing north and he was directly in front of me. I don't know, I don't remember how his body was placed over Mr. Prudente.

Q.      Okay.
A.      I just remember, I just remember Lieutenant Czapiewski just trying to hold Mr. Prudente down.

Q.      Do you recall how Lieutenant Czapiewski was holding Mr. Prudente down?
A.      I think he just had an arm, but I don't recall, truthfully.

Q.      Okay. And do you remember what part of his arm – or, I'm sorry, what part of Mr. Prudente's body his arm was making contact with?
A.      I don't.

Q.      Okay. Do you recall whether Mr. Prudente was handcuffed at that time?
A.      I do know that he was handcuffed, yeah, when I just got there he was handcuffed.

…

A.      I remember him screaming. I remember at one point him yelling at me and saying he was going to die. And, then, shortly thereafter, I believe, I believe it was Lieutenant Czapiewski had told me to contact Metro. And, then, at that point he, Mr. Prudente went limp and went purple, and then we took the handcuffs off. I did a sternum rub to try to see – perform lifesaving measures and began CPR on Mr. Prudente.

Q.      When he was screaming, was he saying anything or was he just screaming?
A.      I mean, he was screaming a whole bunch of stuff, but I didn't understand. The one thing I remember was – did you catch that?

Q.      Yeah. That cut out big time.
A.      Okay. Like I said, I just remember the one thing of him saying he was going to die.

See Doc. No. 46-4, pp. 15-17.


**7.      BCI Investigation**

On February 8, 2020, the Mandan Police Department contacted the North Dakota Bureau of

18

Investigations (hereinafter "BCI") to conduct an independent and unbiased excessive force investigation. Sergeant David Raugust and Officer Mary Hamilton were placed on administrative duties during the investigation of the cause of death. Special agents immediately began gathering all the facts and analyzed them thoroughly to develop a complete picture of what happened.

The investigation included the following acts:

- Review of dashcam audio and video footage from Lieutenant Czapiewski, Officer Hanson, and Deputy Shaun Peterson's patrol vehicles;

- Interviews of Cody Prudente, John Prudente, Sr., and Sandra Prudente;

- A search of the exterior areas of Prudente's residence located at 202 7th Avenue Southwest in Mandan. The search included photographs and a collection of evidence;

- Review of the call for service reports from the Mandan Fire Department and Metro Area Ambulance Service;

- Review of the Axon Taser reports from the Tasers utilized by Sergeant David Raugust and Officer Mary Hamilton;

- Review of Prudente's toxicology reports;

- Review of the dispatch recordings and event report logs from Central Dakota Communications Center;

- Review of the completed written reports of Lieutenant Czapiewski, Officer Hauck, Officer Hanson, and Officer Scherr. The reports documented each officer's observations and actions.

- Review of photographs depicting the injuries Sergeant Raugust sustained from Prudente; and

- An agent attended Prudente's autopsy.

The information was provided to the Morton County State's Attorney's Office without recommendation. The Morton County State's Attorney's Office reviewed the information and

determined no crime was committed by officers involved  and no criminal charges were pursued.

The autopsy revealed no evidence of the excessive use of force.  The results of the autopsy concluded the death of Prudente was due to excited delirium as a result of methamphetamine use and schizophrenia.  Prudente has not disclosed any medical experts in this case.  Sergeant Raugust and Officer Hamilton, who had been on administrative leave, returned to full duty on April 9, 2020.

### 8.    John Prudente, Sr.

John Prudente, Sr. was present at the location Prudente fled to and witnessed the majority of Prudente's seizure:

Q.    Okay. And then after the female officer was doing that, the male officer,
        Raugust, then grabbed him and tackled him or something?
A.    Yeah.

Q.    Around the waist kind of tackled him?
A.    Not really. Around the throat. He put him in a choke hold is what he did.

Q.    Okay.
A.    And then she come up and handcuffed him. And then I told them, You're
        going to kill him if you keep choking him. You better let him go, you know.
        That's when I got in a scuffle with that Hanson. He said that I threw him
        through those windows. He threw me through the windows I had sitting there.
        Then they tried to get me to get out of the yard. I told that guy, I said, You
        better let go of him. You better not kill him, because if you do, there's going
        to be trouble. He never batted an eye, just  kept choking him. Then they drug
        me out in the front yard.

Q.    Okay.  Let me break that down some. When you say they drug you out, do
        you know who?
A.    Hanson. I don't know who the other one was with him, but there was a bunch of cops there then.
Q.    And at that point there was two of them that were escorting you out; is that
right?
A.    Yeah.

Q.    And at that point John, Jr., was still kicking, screaming and resisting?

A.    No, he wasn't.

Q.    He was limp at that point?
A.    You bet.

Q.    Okay.
A.    He should have let him go when he put handcuffs on him.

Q.    When you said that Mary Hamilton, Mary Ternes or the female lawyer –
      lawyer – been a long day. The female officer got the handcuffs on him; right?
A.    Correct.

Q.    Besides Raugust and Hamilton, were there any other officers around there
      when he first got the handcuffs on?
A.    Yeah, then Hanson was there, too.

Q.    Okay. Any others that you can remember?
A.    There was a lot of them there. I don't remember who they were, but –

Q.    And I'm just trying to first break down how many were there when the
      handcuffs first went on.
A.    There was three.

Q.    Three. Okay. And that was Raugust, Hamilton, and Hanson?
A.    Correct.

Q.    And when the handcuffs were on, John, Jr., was still kicking, fighting,
      swearing?
A.    No, he didn't talk at all. He was being choked out. He couldn't talk.

Q.    Once Raugust took him to the ground, he wasn't making any more sounds?
A.    No. I told him right then, I jumped up and I – I should have punched that
      Raugust right out of there, but, you know, that's when they got – got me out
      of there, kicked me out of my yard.

See Doc. No. 49-6, pp. 51-54.

## II.       **STANDARD OF REVIEW**

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  Id.  The purpose of summary judgment is to assess the evidence and determine if a trial is genuinely necessary.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial.  Id.; Fed. R. Civ. P. 56(c)(1).  If the record taken as a whole and viewed in a light most favorable to the non-moving party could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is appropriate.  Matsushita, 475 U.S. at 587.

### III.    LEGAL DISCUSSION

As a preliminary matter, it is undisputed that the official capacity claims against the five named City of Mandan police officers and the claims against the City of Mandan itself fail as a matter of law and those claims should be dismissed.  The Defendants contend they are entitled to qualified immunity on the Plaintiffs' Section 1983 excessive force and deliberate indifference claims.  The Plaintiffs maintain questions of fact preclude the grant of qualified immunity on their Section 1983 claims.  The Defendants also ask for summary judgment of the Plaintiffs' state law claims which they contend are tied to the analysis of the Section 1983 claims.

### A.    QUALIFIED IMMUNITY

42 U.S.C. § 1983 provides a cause of action against government officials who deprive other persons of "rights, privileges, or immunities secured by the Constitution."  Hayek v. City of St. Paul, 488 F.3d 1049, 1054 (8th Cir. 2007) (quoting 42 U.S.C. § 1983).  However, the doctrine of qualified immunity shields public officials performing their duties from civil liability as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Stanton v. Sims, 571 U.S. 3, 5-6 (2013); El-Ghazzawy v. Barthiaume, 636 F.3d 452, 456 (8th Cir. 2011).  The purpose of the doctrine is to allow public officials to perform their duties "as they think right, rather than acting out of fear for their own personal fortunes."  Greiner v. City of Champlin, 27 F.3d 1346, 1351 (8th Cir. 1994).  The doctrine gives public officials "breathing room" to make reasonable mistakes of judgment and protects "all but the plainly incompetent or those who knowingly violate the law."  Stanton, 571 U.S. at 6 (internal citations omitted).  Whether an official is entitled to qualified immunity is a question of law for the court.

Greiner, 27 F.3d at 1352.  "Qualified immunity is not just a defense to liability, it constitutes immunity from suit."  Hanig v. Lee, 415 F.3d 822, 824 (8th Cir. 2005).

In assessing a claim of qualified immunity the court must consider (1) whether the facts, viewed in a light most favorable to the plaintiff, establish the violation of a constitutional or statutory right, and (2) whether the right was clearly established such that a reasonable official would have known his actions were unlawful.  El-Ghazzawy, 636 F.3d at 456; Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012).  The court may consider these questions in either order.  Sanders v. Newton, 117 F.4th 1059, 1067 (8th Cir. 2024).  The second step of the analysis is fact-intensive and "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006).  If no constitutional violation occurred, the evaluation ends there.  Fagnan v. City of Lino Lakes, 745 F.3d 318, 322 (8th Cir. 2014).

### 1.    **EXCESSIVE FORCE**

It is well-established that individuals have a Fourth Amendment right to be free from excessive force in the context of an arrest.  Small v. McCrystal, 708 F.3d 997, 1005 (8th Cir. 2013) *abrogated on other grounds by* Laney v. City of St. Louis, 56 F.4th 1153, 1157 n.2 (8th Cir. 2023). Claims of excessive force related to arrests are analyzed under the Fourth Amendment's objective reasonableness standard.  Hassan v. City of Minneapolis, Minn., 489 F.3d 914, 919 (8th Cir. 2007). The test for qualified immunity is whether the amount of force used was objectively reasonable under the particular facts and circumstances of the case.  Michael v. Trevena, 899 F.3d 528, 532 (8th Cir. 2018).  The reasonableness of the amount of force used must be judged from the perspective of

a reasonable officer at the scene rather than by the 20/20 vision of hindsight.  Bishop v. Glazier, 723 F.3d 957, 961 (8th Cir. 2013); Carpenter v. Gage, 686 F.3d 644, 649 (8th Cir. 2012) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)); see also Kukla v. Hulm, 310 F.3d 1046, 1050 (8th Cir. 2002).  The nature and quality of the intrusion on the individual's Fourth Amendment rights must be balanced against the government's countervailing interests.  Montoya v. City of Flandreau, 669 F.3d 867, 871 (8th Cir. 2012).  Reasonableness depends on all the relevant circumstances including the severity of the offense at issue, whether the suspect poses an immediate safety threat, and whether the suspect is actively resisting arrest, or attempting to flee.  Poemoceah v. Morton County, No. 21-1207, 2024 WL 4282613, at *3 (8th Cir. Sept. 25, 2024); Shannon v. Koehler, 616 F.3d 855, 862 (8th Cir. 2010).  The degree of injury suffered is also relevant in that it shows how much force was used.  Montoya, 669 F.3d at 871.  Force is least justified against non-violent misdemeanants who are not fleeing, actively resisting, and pose little or no threat to officer or public safety.  Id.

In this case, Prudente (age 36) fled the scene of a traffic stop after he was advised there was an active warrant for his arrest related to unpaid parking citations.  Officer Hamilton and Sergeant Raugust pursued Prudente.  Prudente only traveled a few blocks before exiting his vehicle and attempting to enter his father's home where he lived.  He refused all commands to stop.  Instead Prudente yelled at and fought with the law enforcement officers while trying to get away from them.  Prudente poked Sergeant Raugust in the eye and bit him, puncturing Sergeant Raugust's skin.  Prudente fought violently with the officers attempting to hit and kick them.  Sergeant Raugust deployed his Taser one time in an attempt to gain control over Prudente but the prongs missed the mark.  Officer Hamilton used her Taser three times on Prudente.  The first deployment was a drive

stun to Prudente's right buttock for one second. The second deployment resulted in the prongs lodging in Prudente's back side waist area for five seconds. The third deployment was a drive-stun to Prudente's right thigh for three seconds. None of the Taser deployments by Officer Hamilton seemed to have much effect. Eventually, Officers Scherr, Hanson, and Czapiewski arrived on scene and the five Officers were able to handcuff Prudente. Shortly thereafter, the officers noticed Prudente was not breathing and life-saving measures were undertaken. Unfortunately, those efforts failed and Prudente could not be revived. The entire altercation lasted just a few minutes but was violent, intense, and quickly evolved. An autopsy revealed Prudente died of excited delirium as a result of methamphetamine use and schizophrenia with physical exertion being a contributing factor.

The Court has carefully reviewed the entire record and fails to see any evidence of excessive force. Prudente violently resisted arrest and the use of a Taser under such circumstances is not unreasonable. "Qualified immunity protects reasonable mistakes of fact. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Sanders v. Newton, 117 F.4th 1059, 1067 (8th Cir. 2024). There no evidence in the record that Officers Scherr, Hanson, and Czapiewski used excessive force in arresting Prudente.

The Plaintiffs contend the timing of the Taser deployments and the use of prone positioning create genuine issues of material fact which require trial. However, the plaintiffs have no expert witness or other evidence to support their contention. The uncontested report of defense expert Mark Kroll explains the correct time syncing of the Taser deployments. See Doc. No. 48-1, p. 7. Dr. Kroll explains that the use of a Taser did not cause Prudente to go into cardiac arrest. See Doc. No.

48-1, pp. 19-20. The use of a Taser in drive-stun mode only causes discomfort and does not incapacitate the suspect. De Boise v. Taser Int'l, Inc., 760 F.3d 892, 895 n. 5 (8th Cir. 2014). Sergeant Raugust missed when he fired his Taser. Officer Hamilton twice used her Taser in drive-stun mode and just once with the prongs deployed. The use of a Taser under such circumstances cannot be considered excessive force against a suspect violently resisting arrest. See De Boise, 760 F.3d at 896-98. Dr. Kroll explains in his report that the use of prone restraint did not did not cause Prudente to go into cardiac arrest. See Doc. No. 48-1, pp. 8-9 and 21-29. The autopsy report, the results of which are uncontested, reveals Pudente did not die from excessive force but rather from excited delirium as a result of methamphetamine use and schizophrenia with physical exertion being a contributing factor. The Court concludes as a matter of law that the amount of force used in this case was objectively reasonable. Further, even if the amount of force was unreasonable, violent subjects fleeing law enforcement and acting aggressively have no clearly established right to be free from being repeatedly Tased. De Boise, 760 F.3d at 897-98.

## 2.    DELIBERATE INDIFFERENCE

The Plaintiffs also contend the officers were deliberately indifferent to Prudente's serious medical needs in violation of his rights under the Fourteenth Amendment. To establish a claim based on deliberate indifference, an arrestee must demonstrate that he suffered from an objectively serious medical need, and that the officers had actual knowledge of those needs but deliberately disregarded them. Poemoceah, 2024 WL 4282613, at *3; Carpenter, 686 F.3d at 650. A showing of negligence is not sufficient to meet this burden. Carpenter, 686 F.3d at 650.

In this case, Prudente was clearly suffering a serious medical need when he stopped

breathing.  The law enforcement officers involved were well aware that he had stopped breathing.  However, the officers took all reasonable efforts to render assistance.  Those efforts included advising the ambulance that was already on its way that the situation was critical, removing the handcuffs, applying a sternum rub, and administering Narcan.  The officers obtained an AED and placed the pads on Prudente but no shock was advised.  The officers also began performing CPR and continued to do so until the ambulance arrived and paramedics took over life saving measures.  The Plaintiffs do not identify what measures should have been taken that were not taken.  The autopsy concluded Prudente's death was due to excited delirium as a result of methamphetamine use and schizophrenia with physical exertion being a contributing factor.  The Court concludes as a matter of law that the officers were not deliberately indifferennt to Prudente's serious medical needs.


### B.    STATE LAW CLAIMS

In addition to the Section 1983 claims, the complaint states claims for assault and battery and negligence.  The Court's reasonableness determination in relation to the claims for excessive force and deliberate indifference controls as to the state law claims as well.  See Dundon v. Kirchmeier, 577 F. Supp. 3d 1007, 1067 (D.N.D. 2021); Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010) ("Where a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, our determination of the reasonableness of the force used under § 1983 controls our determination of the reasonableness of the force used under the common law assault and battery claims.").  Because the amount of force used in this case was not unreasonable, the law enforcement officers were not indifferent to or negligent in responding to Prudente's medical needs, and the cause of death was ruled to be excited delirium due to methamphetamine use, the Defendants are entitled

to summary judgment on the Plaintiffs' state law claims as well.

## IV.    <u>CONCLUSION</u>

The Court has carefully reviewed the entire record, the parties' briefs, and relevant case law. For the reasons set forth above, the Court concludes the Defendants are entitled to qualified immunity. Accordingly, the Defendants' motion for summary judgment (Doc. No. 46) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 9th day of December, 2024.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court